## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Sherry Halligan, (R89433),    )
    )
        Petitioner,    )
    )    Case No. 17 C 3757
    v.    )
    )    Chief Judge Ruben Castillo
Margaret Burke, Warden,    )
Logan Correctional Center,    )
    )
        Respondent.    )

## MEMORANDUM OPINION AND ORDER

Petitioner Sherry Halligan, a prisoner confined at the Logan Correctional Center, brings this counseled habeas corpus action pursuant to 28 U.S.C. § 2254 challenging her 2003 murder conviction from the Circuit Court of Cook County. The Court denies the petition on the merits, and declines to issue a certificate of appealability.[1]

## I.    Background

The Court draws the following factual history from the state court record. (Dkt. 12.) State court factual findings have a presumption of correctness, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. 2254(e)(1)). Petitioner has not made such as showing.

Petitioner shot and killed Dennis Campbell at her home in LaGrange, Illinois, on January 31, 2003. *Illinois v. Halligan*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *1 (Ill. App. Ct. Sept. 5, 2014) ("*Halligan Direct Appeal*"). She confessed to the police the next day. *Id.*

---

[1] Respondent answered the habeas corpus petition, (Dkt. 11.), and Petitioner was ordered to reply by November 13, 2017. (Dkt. 13.) Petitioner did not file a reply or otherwise request an extension of time. Petitioner has forfeited the ability to bring a reply making the case ready for a ruling from the Court. *Walter v. BAC Home Loan Servicing, LP*, No. 16 C 9120, 2017 WL 2958249, at *1 n.3 (N.D. Ill. July 11, 2017).

Petitioner was indicted for murder in February 2003, and was placed on bond. *Id.* She was examined by Dr. Jonathan Kelly, a staff forensic psychologist employed by Cook County's Forensic Clinical division. *Id.* Dr. Kelly concluded that Petitioner was fit to stand trial, and legally sane at the time of the killing. *Id.*

Petitioner fled prior to a pretrial hearing in April 2004. *Id.* She was a fugitive until her arrest in July 2010. *Id.* She was found in Palos Hills, Illinois living under the assumed name of "Katherine White." *Id.* She had a different hair color and various forms of identification for her alias. *Id.*

Petitioner claimed at her bench trial that she killed Campbell in self-defense. (Dkt. 12-11, pg. 12.) She explained that she began dating Campbell in 1999. (Dkt. 12-12, pgs. 46-47.) Campbell was six feet tall, 180 pounds, while Petitioner was five feet two inches tall, and weighed 110 pounds. *Id.* at 47. Petitioner described Campbell as "Jekyll and Hyde," with their relationship alternating between sweet and romantic, and abusive. *Id.* at 57.

Petitioner said that Campbell abused her "many, many times." *Id.* at 50. Campbell allegedly attempted to control Petitioner by telling her what to do, where she could go, and whom she could see. *Id.* at 48, 51-52. Additionally, Campbell, who owned multiple guns, would point them at her. *Id.* at 51.

In one incident, according to Petitioner, Campbell banged her head on a wooden floor when she refused to have sex with him. *Id.* at 49. Another time, when Campbell suspected that Petitioner was cheating on him, he put her in the back of his car trunk and drove her to the woods. *Id.* at 53-54. Campbell took her out of the trunk, and showed her a hole he had dug. *Id.* at 54.

According to Petitioner, Campbell put her face in the hole, and told her this would be her grave if she ever cheated on him again. *Id.*

The relationship ended in December 2000, but Campbell allegedly began stalking Petitioner. *Id.* at 55. The stalking stopped in March 2001 when Campbell moved to Florida for a job transfer. *Id.* at 56. Petitioner had no contact with Campbell until the fall of 2002 when he wrote her love letters. *Id.* at 57. Petitioner resumed contact with Campbell in the fall of 2002, communicating with him by telephone and email. *Id.*

Petitioner and Campbell spent a day together in Illinois around Christmas 2002. *Id.* at 58. She described the day as "wonderful," saying that Campbell was loving and very apologetic. *Id.* at 59. She and Campbell had consensual sex during this visit. *Id.* at 60. Petitioner and Campbell continued communicating by emails and phone calls between the Christmas 2002 visit until Campbell's death on January 30, 2003. *Id.*

Campbell was in Illinois on January 30th for a work matter. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *2. Petitioner met Campbell and his boss, Mickey Kovacs, for dinner. (Dkt. 12-12, pg. 61.) Campbell allegedly asked Petitioner during dinner to have sex with Kovacs, but she refused. *Id.* After dinner, Petitioner and Campbell went back to Petitioner's hotel room where they argued over Campbell's demand. *Id.* at 64. Petitioner claims their argument was loud enough that security kicked them out of the hotel. *Id.* at 65.

Petitioner and Campbell drove to Petitioner's nearby home. *Id.* Petitioner's car was not at her house because she had switched her car with her brother earlier that day or a day before. *Id.* at 66.

Petitioner claimed Campbell was "livid," and "very, very, angry with me," and was red in the face as they entered her home. *Id*. at 67. Petitioner testified that Campbell attempted to attack her by her picking her up by the shoulders, calling her a "rotten bitch," and threating to kill her. *Id*. at 69. Petitioner grabbed a gun from a nearby shelf, and shot Petitioner five times. *Id*. at 69-70.

Petitioner did not call 911 after the shooting, instead staying in the house for a period of time. *Id*. at 71. She explained that she went upstairs, packed and then unpacked clothes, and washed her hands. *Id*. She drove Campbell's car back to the close-by hotel and walked home. *Id*. Once back home, Petitioner covered Campbell's body with a sheet, changed clothes, and placed her old clothes and the gun in a white plastic bag. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *2. She drove her brother's car two hours south on Interstate 55 before throwing the bag out onto the interstate median. *Id*. The LaGrange police would later retrace Petitioner's trip down I-55, but were unable to locate the white plastic bag with Petitioner's gun and clothes. (Dkt. 12-11, pgs. 113-14.)

Petitioner contacted her brother during her trip, and he hired an attorney for Petitioner. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *2. Petitioner returned the next day, and met police officers at the LaGrange police station with her attorney. *Id*. She gave both verbal and videotaped statements confessing to the shooting. *Id*. at 1. The police went to Petitioner's home and discovered Campbell shot dead in the living room. (Dkt. 12-11, pg. 57.) The officers also found that Petitioner's computer was missing. *Id*. at 101. Blood was recovered from Petitioner's brother's car. (Dkt. 12-12, pg. 17). DNA testing matched the blood in the brother's car to Campbell. *Id*. at 20.

The police also went to Campbell's hotel room where they discovered that the room telephone's voice mail message light was on. (Dkt. 12-11, pg. 102-03). The officers recorded the phone messages, which were played at trial. *Id.* at 111.[2]

Psychologists Drs. Karla Fisher and Steven Rothke testified on Petitioner's behalf. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *3. Dr. Fisher was qualified as an expert in the psychological effects of domestic violence. Dr. Rothke was qualified as an expert in clinical psychology and neuropsychology. *Id.* Though both experts evaluated Petitioner independently, they relied on her self-reporting and did not review any of her prior medical history or other reports when forming their opinions. *Id.*

Dr. Fisher opined that Petitioner suffered from Battered Woman Syndrome (BWS). *Id.* at *1. She explained that Petitioner had been subjected to a number of abusive relationships in her life. *Id.* at *3. Dr. Fisher concluded that, as a battered woman, Petitioner was "terrified" that Campbell was about to kill her when she shot him. (Dkt. 12-12, pg. 163.) Dr. Fisher explained that, in her opinion, Petitioner shot Campbell as a manifestation of her "fight or flight" reflex in light of her fear for her own life. *Id.* at 163-64.

Dr. Rothke administered a number of neuropsychological tests on Petitioner. (Dkt. 12-13, pg. 14.) He explained that Petitioner reported multiple symptoms suggesting the presence of a brain injury or neurological disorder including: headaches, tinnitus, noise and light sensitivity, dizziness, forgetfulness, difficulty with attention and concentration, and poor sleep. *Id.* Dr. Rothke's identified several cognitive deficits in Petitioner including limitations on mental flexibility, self-monitoring during task performance, spatial reasoning and recall, forgetfulness,

---

[2] The recordings of the Petitioner's videotaped confession, and the hotel phone messages played at trial were not included in the record filed with the Court.

attention and concentration, word finding, and visuomotor speed and sequencing. *Id.* at 27. These results led Dr. Rothke to opine that Petitioner suffered from a cognitive disorder due to a traumatic brain injury. *Id.* at 28. She also showed post-concussion syndrome and residual features of post-traumatic stress disorder. *Id.* Dr. Rothke opined that Petitioner's condition was the result of multiple blows to her head over multiple years. *Id.*

The prosecution's theory of the case was that Petitioner killed Campbell because she was a scorned woman. (Dkt. 12-13, pg. 136.) To rebut Petitioner's self-defense argument, the prosecution called Jessie McQueen. She testified that she had been in an eight-and-half year relationship with Campbell at the time of killing. (Dkt. 12-11, pg. 169.) She and Campbell had lived in the same building in Willowbrook, Illinois when they began dating. *Id.* at 170-71. She moved with him to Florida in 2001, and the two of them shared a home together in Florida. *Id.* at 170. McQueen testified that Campbell had a peaceful reputation, and never abused or assaulted her. *Id.* at 174-75.

The prosecution also called two expert witnesses to rebut Petitioner's experts. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *3. The experts both worked for the Cook County Forensic Clinical Services division. *Id.* One expert was qualified in forensic psychology, and the other in clinical psychiatry. *Id.* The state's experts both evaluated Petitioner, and reviewed her medical records. *Id.* The prosecution's experts opined that Petitioner did not suffer from battered woman syndrome or post-traumatic stress disorder. *Id.* Of note, the prosecutions' experts pointed out that there was no objective source of data such as medical records showing physical abuse or head trauma to support the claims by Petitioner and her experts' opinions. (Dkt. 12-13, pgs. 77, 120.)

At the conclusion of the bench trial, the trial judge, as the finder of fact, found Petitioner guilty of murder. *Id.* The judge explained that there was no dispute that Petitioner killed Campbell. (Dkt. 12-13, pg. 164.) Instead, the only issue was whether she intended to murder Campbell, acted in self-defense, or based upon an unreasonable belief that her life was in danger. *Id.* The judge found that Petitioner was not credible and rejected her self-defense claim. *Id.* at 168-70.

The judge found inconsistencies between Petitioner's in-court testimony regarding the shooting, and her videotape confession given to the police. *Id.* at 167-68. He questioned Petitioner clam of self-defense in light of the fact that she disposed of evidence immediately after the killing, and was a fugitive for many years. *Id.* at 168, 170. The judge further found that Jessie McQueen's testimony that Campbell did not abuse her during their multiple year relationship rebutted Petitioner's allegations of abuse. *Id.* at 168-69.

The trial judge pointed out that Petitioner voluntarily joined Campbell at his hotel room after dinner the night of the killing. *Id.* at 168. The judge wondered why Petitioner did not part company with Campbell at dinner if he had propositioned her to have sex with his boss, which led to the argument, as she claimed. *Id.*

The trial judge also pointed out Petitioner's ability to access the gun in her home. *Id.* The judge found it "inconceivable" that Petitioner would have arms-length access to a gun in the exact location where Petitioner allegedly chose to attack her in her home. *Id.*

Finally, the court chose to credit the state's expert witnesses over Petitioner's. *Id.* at 166. The judge found the prosecution's experts more credible because they examined Petitioner's medical records, while Petitioner's experts relied solely on Petitioner's self-reporting. *Id.* The

trial judge stated that he would have expected to see evidence of physical injuries from the alleged abuse, and the lack of medical record undermined Petitioner's experts' opinions. *Id.*

The trial court found Petitioner guilty and sentenced her to 45 years of imprisonment. Petitioner's conviction was affirmed by the Appellate Court of Illinois on direct appeal, *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *1, and the Supreme Court of Illinois denied her petition for leave to appeal (PLA). *Illinois v. Halligan*, No. 118415, 23 N.E.3d 1204 (Ill. Jan. 28, 2015) (Table).

Petitioner then brought a post-conviction petition under Illinois's Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq. Illinois v. Halligan*, 2016 IL App (1st) 153566-U, 2016 WL 6603301, *4 (Ill. App. Ct. Nov. 4, 2016) ("*Halligan Post Conviction Appeal*"). The state trial court denied the petition, and the denial was affirmed on appeal by the Appellate Court of Illinois. *Id.* at *9. The Supreme Court of Illinois denied her PLA request in her post-conviction case. *Illinois v. Halligan*, No. 121741, 80 N.E.3d 4 (Ill. Mar. 29, 2017) (Table). Petitioner now brings the present habeas corpus petition.

## II. Analysis

### A. Governing Standard

A writ of habeas corpus cannot issue unless Petitioner demonstrates that she is in custody in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). As the state courts adjudicated Petitioner's claims on the merits, the Court's review of the present habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as

8

determined by the Supreme Court of the United States, or the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d).

"'A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)). "An 'unreasonable application' occurs when a state court 'identifies the correct legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of Petitioner's case.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Williams v. Taylor*, 529 U.S. 362, 413 (2000) (opinion of O'Connor, J.)).

Clearly established federal law refers to the "'holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). The state court is not required to cite to, or even be aware of, the controlling Supreme Court standard, as long as the state court does not contradict the Supreme Court standard. *Early v. Packer*, 537 U.S. 3, 8 (2002). The Court begins with a presumption that state courts both know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citations omitted). This presumption is especially strong when the state court is considering well established legal principles that have been routinely applied in criminal cases for many years. *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).

The Court's analysis is "backward looking." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). The Court is limited to reviewing the record before the state court at the time that court

made its decision. *Id.* The Court is also limited in considering the Supreme Court's "precedents as of 'the time the state court renders its decision.'" *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quoting *Cullen*, 562 U.S. at 182; *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003)) (emphasis omitted).

"The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 134 S. Ct. 1702 (2014); *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181 (quoting *Woodford*, 537 U.S. at 24).

### B.     Petitioner's Claims

Before examining the underlying merits, the Court notes that Petitioner's habeas corpus petition, filed by retained counsel, is replete with perfunctory and undeveloped arguments, and does not include a single citation to legal authority or the state court record. The failure to properly develop and support arguments before this Court is sufficient grounds to deny the habeas corpus petition. *Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016). For completeness purposes, however, the Court shall examine the merits of Petitioner's individual claims.

### 1. Claim One

Claim one alleges ineffective assistance of Petitioner's trial counsel for failing to: (a) move to suppress her confession; (b) challenge the admissibility of her videotaped confession on insufficient foundation grounds; (c) adequately cross-examine her brother, the arresting officer, the officer who interrogated Petitioner, the officer who searched the hotel room, and the state's expert; (d) object to Jessie McQueen's testimony that Campbell had a peaceful character; and, (e) present evidence from Kovacs, hotel security, and community members. These arguments were rejected by the Appellate Court of Illinois on direct appeal. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at \*9-\*12. When addressing the state court's denial of these claims, this Court looks to the state appellate court's decision because that court was the last state court to address the claim on the merits. *Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015).

Petitioner's ineffective assistance of counsel arguments are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate ineffective assistance of counsel, Petitioner must demonstrate both deficient performance and prejudice. *Premo*, 562 U.S. at 121 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). The Court's review under *Strickland* is deferential, and applying *Strickland* under the AEDPA (which itself also requires deference) results in a double level of deference to the state court determination. *Knowles*, 556 U.S. at 123.

The state appellate court decision is neither contrary to, nor an unreasonable application of, *Strickland*. The state court properly identified, set forth, and applied the *Strickland* standard. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at \*9-\*10. Before turning to Petitioner's individual arguments, the Court notes that counsel's performance is evaluated as a whole under *Strickland*. *Brown v. Finnan*, 598 F.3d 416, 422 (7th Cir. 2010). The

Court's review of counsel's performance is highly deferential because there is a presumption that the challenged actions might be considered sound trial strategy. *Bell v. Cone*, 535 U.S. 685, 698 (2002) (citations omitted).

Reviewing counsel's performance as a whole, it was not constitutionally ineffective. There is no dispute that Petitioner shot and killed Campbell. Campbell's dead body was in her home, she disposed of the murder weapon and related evidence during her drive down Interstate 55, she confessed to shooting Campbell, and then later fled living as a fugitive for many years.

Faced with these facts, counsel's only plausible strategy was to argue that Petitioner killed Campbell in self-defense. To that end, Petitioner marshalled two experts in an attempt to bolster Petitioner's own testimony. Unfortunately for Petitioner, the finder of fact rejected her self-defense claim. But, the guilty verdict does not undermine the fact that trial counsel provided Petitioner a proper defense based on the facts of the case. When viewed as a whole, counsel provided competent representation of Petitioner.

Turning to Petitioner's individual grounds, she first argues that her counsel was ineffective for failing to move to suppress her police confession. To demonstrate ineffective assistance of counsel for failing to file a motion to suppress, Petitioner show that her "'Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.'" *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

The state appellate court held that defense counsel's decision not to challenge the confession was a reasonable strategic decision, and in addition, Petitioner could not demonstrate

prejudice. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *12. Regarding the question of counsel's strategy, the state appellate court's finding is correct that the introduction of Petitioner's police confession is consistent with the overall self-defense strategy. The confession made an immediate claim of self-defense at her first statement to authorities.

Additionally, as the state court properly noted, there are no grounds in the record suggesting that Petitioner's confession was improperly obtained. The record does not suggest that the police coerced Petitioner. To the contrary, Petitioner voluntarily sought out the police to explain the shooting as self-defense. She obtained a lawyer prior to contacting the police, and the lawyer was present during the police interview. There is nothing in the record to suggest that the police coerced Petitioner into confessing, or that her statement was taken in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Petitioner cannot demonstrate that the state court ruling rejecting this argument was an unreasonable application of *Strickland*.

Petitioner next faults her trial counsel for failing to challenge the foundational admissibility of her videotaped confession. She points out that the videotape was created by a commercial source, but makes no argument challenging the authenticity of the record. The state appellate court rejected this argument holding that Petitioner failed to establish both deficient performance and prejudice. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *10.

This Court sees no grounds to support Petitioner's argument. Videotaped evidence is admissible in Illinois as long as it is properly authenticated. *Illinois v. Taylor*, 956 N.E.2d 431, 437 (Ill. 2011). Petitioner makes no argument suggesting that videotape played at her trial was not authentic.

Additionally, as discussed above, trial counsel competently pursued a strategy of arguing self-defense. Petitioner's videotaped confession supported the self-defense argument, and so trial counsel had valid reasons to not challenge the confession. Furthermore, by stipulation to the videotape's admissibility, defense counsel strategically attempted to focus the case on the disputed self-defense issue. *United States v. Lockwood*, 789 F.3d 773, 780 (7th Cir. 2015) (recognizing that defendant entered into stipulation on secondary issues so that finder of fact would focus attention on primary issues). The state appellate court's ruling rejecting Petitioner's argument was not an unreasonable application of *Strickland*.

Petitioner next challenges trial counsel's failure to object more often during the direct examination of, and better cross-examination (or cross-examination of) her brother, the arresting officer, the officer who interrogated Petitioner, the officer who searched the hotel room, and the State's expert. The state appellate court rejected the argument explaining that the manner in which a particular witness is cross-examined is a matter of trial strategy, and Petitioner could not demonstrate how she was prejudiced by trial counsel's actions. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *10.

The state court is correct that "deciding what questions to ask a prosecution witness on cross-examination is a matter of strategy." *United States v. Jackson*, 546 F.3d 801, 813 (7th Cir. 2008). Additionally, Petitioner's present habeas corpus petition, like her state court challenge on this issue, "fail[]s to present any argument or evidence that she was prejudiced by any failure of her trial counsel to make more objections or to cross-examine the State's witnesses." *Halligan*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *10. The state appellate court's rejection of this argument was not an unreasonable application of *Strickland*.

Petitioner next argues that her counsel was ineffective for failing to object to Jesse McQueen's testimony regarding Campbell's peaceful character being presented in the prosecution's case in chief. In rejecting Petitioner's argument, the state appellate court explained that the prosecution may present a victim's reputation for peacefulness for rebuttal purposes only after the defendant has first attacked the victim's reputation. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *11. However, the attack on the victim's character opening the door to the rebuttal witness can occur in the opening statements. *Id.* That occurred in this case, as defense counsel challenged the victim's character by asserting self-defense in the opening statements. (Dkt. 12-11, pg. 13) (in his opening statement, defense counsel stated that Petitioner and the victim's relationship "had degenerated" from friendly one "into one which she was emotionally, physically, and sexually abused on a regular basis.") Defense counsel's discussion of Petitioner's self-defense defense in opening statements, for which he certainly cannot be faulted, necessarily opened the door for rebuttal evidence of the victim's character.

Furthermore, the underlying question of when it was proper for McQueen to testify during the prosecution's case in chief is an evidentiary issue governed by Illinois law. In turn, the Court is bound by the state appellate court's state law ruling that the prosecution could properly present McQueen's testimony in its case in chief because defense counsel raised self-defense in opening statements. *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013) (citations omitted) ("[A]lthough claims of ineffective assistance of counsel can be premised on an attorney's failure to raise state-law issues, federal courts reviewing such claims must defer to state-court precedent concerning the question of state law underlying the defendant's ineffectiveness claim."). The Court is bound by the state appellate court's state law ruling that the prosecution could properly

present McQueen's testimony in its case in chief. Consequently, the state court's denial of Petitioner's related ineffective assistance of counsel argument is not an unreasonable application of *Strickland*.

Petitioner's final ineffective assistance of counsel argument challenges the quantity of evidence marshalled by her defense attorney. She claims that the evidence presented by counsel consisting of her testimony and her two experts was insufficient. She challenges why there was no testimony from Kovacs, hotel security, and other sources. In denying her argument, the state appellate court held that there was nothing in the record to indicate that these potential witnesses would have been beneficial to her case. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *11. Petitioner cannot "simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991). There is nothing in the record to suggest that defense counsel failed to call a witness who would have presented testimony favorable to Petitioner. The state appellate court's ruling is not an unreasonable application of *Strickland*. Claim One is denied.

### 2.    Claim Two

Claim Two raises an ineffective assistance of counsel based on trial counsel's alleged conflict of interest. Attorney Joseph DiNatale initially represented Petitioner, and was present when Petitioner confessed to the police. *Halligan Post Conviction Appeal*, 2016 IL App (1st) 153566-U, 2016 WL 6603301, at *1. Petitioner was released on bond following her confession. She then fled for six years. *Id.* Upon Petitioner's capture, DiNatale moved to withdraw because:

(1) Petitioner had not communicated with him while she was a fugitive; and, (2) the prosecution notified him that he was a potential witness regarding Petitioner's statements to the police. *Id.*

The trial court granted DiNatale leave to withdraw, and he was replaced by a new attorney, John Quick. *Id.* The trial court also allowed Petitioner's bond to be exonerated, the proceeds of which were used to pay for Quick's representation of Petitioner. *Id.* Quick represented Petitioner through trial. Petitioner's present attorney, Thomas Cernek, began representing Petitioner in her direct appeal.

Petitioner's present claim alleges ineffective assistance of counsel based on a conflict of interest. She claims that her first two attorneys "occupied the small office building," and had "previously discussed the case." (Dkt. 1, pg. 10.) The appearance for the two attorneys listed the same office address, but different telephone numbers, in their respective court filings. The state appellate court, the last state court decision to consider the argument on the merits, denied the issue on post-conviction review holding that there was no conflict of interest. *Halligan Post Conviction Appeal*, 2016 IL App (1st) 153566-U, 2016 WL 6603301, at *6-*9.

Generally, an ineffective assistance of counsel argument is governed by the *Strickland* standard. However, an ineffective assistance of counsel argument based on defense counsel's conflict of interest can be governed by either *Holloway v. Arkansas*, 435 U.S. 475 (1978), or *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *See Mickens v. Taylor*, 535 U.S. 162, 168-69 (2002). Both *Holloway* and *Sullivan* are less demanding standards for a prisoner to meet than *Strickland*.

*Holloway* and *Sullivan* arise out of a situation of a single defense attorney representing criminal codefendants with diverging interests. In *Holloway*, the defense counsel objected to the joint representation based on the conflict, but the trial court denied a request for separate counsel.

*Mickens*, 535 U.S. at 167 (citing 435 U.S. at 485-86). *Holloway* instructs that automatic reversal of a conviction is required when defense counsel is forced to represent codefendants over objection, unless there was no conflict of interest between the interests of the codefendants. *Mickens*, 535 U.S. at 168 (citing 435 U.S. at 488). *Sullivan* holds that *Holloway's* automatic reversal standard does not apply when trial counsel fails to object to a joint representation of defendants, but instead "a defendant must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'" *Mickens*, 535 U.S. at 168 (quoting 466 U.S. at 348-49).

The Supreme Court in *Mickens* recognized that lower courts have extended the *Holloway* and *Sullivan* standard beyond its facts pattern of a conflict of interest between codefendants to a variety of attorney conflict of interest standard including conflicts from representation of former clients, and conflicts arising from an attorney's personal or financial interests. 535 U.S. at 175. *Mickens* critiqued the lower courts explaining that "the language in *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." *Id.* Ultimately, *Mickens* concluded that, despite the Court's reservations, the issue of whether the *Holloway* and *Sullivan* standard could be extended remained an "open question." *Id.* at 176.

The state appellate court decision, although not citing to *Holloway or Sullivan*, applied both an automatic reversal standard, and an actual conflict of interest standard, which mirror the *Holloway* and *Sullivan* standards. *Halligan Post Conviction Appeal*, 2016 IL App (1st) 153566-U, 2016 WL 6603301, at *6-*9. Petitioner did not identify a legal standard in the instant habeas corpus petition, and Respondent's answer applied the *Sullivan* standard. (Dkt. 11, pg. 14.).

Petitioner is not entitled to relief under either *Holloway* or *Sullivan* in light of *Mickens* and the AEDPA. The AEDPA mandates that Petitioner must show that the state appellate court decision denying his conflict of interest claim was contrary to, or an unreasonable application of, clearly established federal law from the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). *Mickens* does not mince words instructing that there is no clearly established Supreme Court precedent supporting the extension of *Holloway* and *Sullivan* to factual patterns that, like in this case, allege a conflict of interest that does not arise from a joint representation of multiple defendants. *See Dassey v. Dittman*, 877 F.3d 297, 318 (7th Cir. 2017) (en banc). The lack of clearly established law mandates that the Court must deny the claim. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam).

The Court appreciates that Respondent's answer did not discuss *Mickens* or the lack of clearly established law, but instead made a *Sullivan* merits argument under the assumption that Petitioner could bring a *Sullivan* based claim. Despite this error, AEDPA's demanding § 2254(d)(1) standard cannot be forfeited or waived by Respondent. *Winfield v. Dorethy*, 871 F.3d 555, 563-65 (7th Cir. 2017). Petitioner is not entitled to relief because there is no clearly established federal law supporting her claim, and Respondent's error does not undue this conclusion.

For completeness purposes, the Court also notes it would find Petitioner's underlying conflict of interest argument meritless even if it could reach them. As mentioned above, Petitioner "must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'" *Mickens*, 535 U.S. at 168 (quoting *Sullivan*, 466 U.S. at 348-49). The "mere

possibility of a conflict is 'insufficient to impugn a criminal conviction.'" *United States v. Lewisbey*, 843 F.3d 653, 657 (7th Cir. 2016) (quoting *Sullivan*, 446 U.S. at 350)).

Petitioner attempts to construct a conflict of interest argument from the facts that: (1) her first attorney, DiNatale, was a potential witness regarding Petitioner's confession to the police; (2) DiNatale and her trial attorney, Quick, worked in the same office building; and, (3) the attorneys worked together to obtain Petitioner's bond in order to pay Quick. These facts simply do not demonstrate a conflict of interest that affected the adequacy of the representation of Petitioner.

Although Petitioner does not elaborate on this point in detail in her habeas corpus petition, she may be arguing that DiNatale withdrew from the case due to the possible conflict of being a witness regarding Petitioner's confession. Petitioner then attempts to impute DiNatale's alleged conflict to Quick by claiming they worked in the same office, and had a joint interest in Petitioner's bail proceedings. As previously discussed, there is nothing in the record to suggest an irregularity regarding Petitioner's confession. There are no grounds suggesting coercion or other impropriety. Petitioner's statement to the police to explain the situation is consistent with defense counsel's self-defense strategy presented at trial. In sum, there is no evidence in the record that Quick and DiNatale had a joint interest in the case, or that their interests conflicted in any way with Petitioner's.[3] Claim Two is denied.

### 3. Claim Three

Petitioner next argues that the prosecutor committed misconduct with improper comments during closing arguments, and cross-examination of Petitioner. The Court notes at the outset that

---

3 The Court notes additionally that Petitioner was represented by two attorneys at trial: Quick and his co-counsel Barry Pechter. (*See, e.g.*, Dkt. 12-12, pg. 2, 15.) Petitioner has not raised any issue regarding Pechter's representation of her or any conflict he may have had, which further undercuts her claim that she was denied the ineffective assistance of counsel at trial.

Petitioner failed provide a citation to the record for the challenged statements. Petitioner's counsel is reminded that it is his obligation to provide citations to the record, and that is the not the Court's responsibility to "root through [] thousands of documents that make up the record [] to make his case for him." *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004).

Turning to Petitioner's claim, she challenges multiple comments by the prosecutor during the closing arguments and the prosecution's cross-examination of Petitioner. The first challenged closing statement involves the victim's boss, Mickey Kovacs. Petitioner claimed that the victim attempted to pressure her into having sex with Kovacs the night of the murder. During closing argument, defense counsel raised the fact that Kovacs was not called as a witness to challenge the strength of the prosecution's case. (Dkt. 12-13, pg. 150-51.)

In rebuttal, the prosecution responded that the defense counsel could have called Kovacs as a witness if there was any relevant evidence. *Id.* at 153. The prosecution further suggested that the reason neither side called Kovacs was that he had nothing relevant to contribute to the case. *Id.* Defense counsel objected to this argument, and the trial court responded that he would not consider the argument if it is was not relevant to the case. *Id.*

Petitioner's second argument pertains to a prosecution closing comment that "hell have no fury like a woman scorned."[4] (Dkt. 12-13, pg. 136.) This comment was made by the prosecution as part of overall theme for the case that Petitioner murdered Campbell after she learned about

---

[4] The habeas corpus petition also challenges the prosecutor's closing argument comment of "Your Honor has to be wondering if there actually is something a little bit more sinister going on the here." (Dkt. 1, pg. 10.) The Court could not find this alleged comment in the prosecution's closing argument.

Campbell's long term relationship with Jessie McQueen. The prosecution argued that Petitioner murdered Campbell because she was a jilted ex-girlfriend, and not in self-defense as she claimed.

In a similar light, Petitioner challenges the prosecution's argument in rebuttal that when the victim's "body is found, his pants are undone. Now do you think that is because maybe she needed his car keys?" (Dkt. 12-13, pg. 156.) Although the prosecution's intention behind the statement seems less clear than other statements, this statement also appears to be an argument related to Petitioner's intent in an attempt to rebut Petitioner's self-defense argument.

The final challenged comment in closing argument involves the prosecution's efforts to challenge Petitioner's testimony that she shot Petitioner in self-defense. Petitioner's challenges the comment of:

> But not only did she have no reasonable belief, but she has failed to prove that she even had an unreasonable belief by a preponderance of the evidence. Now the Defendant does not have to take the stand. Everyone knows the law. She is presumed innocent, doesn't have to take the stand and all of that jazz. . . .

(Dkt. 12-13, pg. 142).

Although not specifically included in Petitioner's argument, this Court notes that the prosecutor continued:

> She is presumed innocent, doesn't have to take the stand and all of that jazz, but she chose to take the stand. And when she takes the stand, you should judge her credibility and there is no better way to judge someone's credibility than to watch them testify in your courtroom, and you would have thought she was up for an academy award. And in fact if there was a category for overacting, she may have just won because she tried to tell you that she was a battered woman, and that is a real insult to real victims of domestic violence. Her testimony is ridiculous. . .

(Dkt. 12-13, pg. 142.) This argument was inappropriate, especially referring to Defendants' constitutional rights as "all that jazz."

Petitioner also challenges two comments when the prosecution cross-examined her of "Lucky for you," (Dkt. 12-12, pg. 99.) and "Oh. Wow. So, when you parked your car there on Cicero, you didn't want people to find it, right?" (Dkt. 12-12, pg. 114.) Petitioner claims that these questions were part of an improper attempt by the prosecutor to "demoralize and overpower her," during cross-examination. (Dkt. 1, pg. 11.)

Petitioner raised these issues in the state court on direct appeal. The Appellate Court of Illinois, the last court to consider Petitioner's claim on the merits, held that the Petitioner only preserved two issues on appeal: (1) the prosecution's closing argument regarding Petitioner's failure to subpoena and call Kovacs as a witness; and, (2) the "Lucky for you," and "Oh. Wow." sarcastic remarks by the prosecutor during Petitioner's cross-examination. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *8. The remaining issues of "hell have no fury," "the victim's pants were found open," and "doesn't have to take the stand and all that jazz" closing argument comments were defaulted because Petitioner failed to properly preserve them through a timely objection and post-trial motion. *Id.* at *7. The state court then reviewed the claims under plain error. *Id.* Respondent asserts that the "hell have no fury," "the victim's pants were found open," and "doesn't have to take the stand and all that jazz" comments are procedurally defaulted in this Court.

The state appellate court's ruling that Petitioner failed to properly preserve her claims of prosecutorial misconduct with represent to the three comments quoted above is an adequate and independent state law ground of decision resulting in the procedural default in this Court. *Gray v. Hardy*, 598 F.3d 324, 329 (7th Cir. 2010). "As a rule, a state prisoner's habeas claims may not be entertained by a federal court 'when (1) a state court has declined to address those claims because

the prisoner has failed to a meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds.'" *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (quoting *Walker v. Martin*, 562 U.S 307, 315 (2011); *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991)).

To be independent, the state court must have actually relied upon the procedural bar as an independent basis for the disposition of the case. *Lee v. Foster*, 750 F.3d 687, 693 (7th Cir. 2014) (citation omitted). The state appellate court decision is clear in its reliance on the state law procedural ground when finding the default. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *8.

To be adequate, the state rule must be "'firmly established and regularly followed.'" *Walker*, 562 U.S. at 316 (quoting *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009)). Illinois's plain error rule is well established to allow the finding of procedural default. *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). Petitioner's argument related to the prosecutor's closing arguments on the "hell have no fury," "the victim's pants were found open," and "doesn't have to take the stand and all that jazz" issues are procedurally defaulted.

Respondent raised the procedural default argument in his answer. (Dkt. 11.) Petitioner was given an opportunity to file a reply (in which she could have responded to the procedural default arguments). (Dkt. 13.) Petitioner failed to file her reply. Thus, she is barred from responding to Respondent's procedural default arguments. *United States ex rel. Bell v. Pierson*, 267 F.3d 544, 555 n.6 (7th Cir. 2001).

For completeness purposes, the Court also notes that, even if the forfeiture was set aside, Petitioner could not excuse her defaults under either cause and prejudice, or fundamental

miscarriage of justice. Regarding cause and prejudice, cause is an "'objective factor, external to [Petitioner] that impeded [her] efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)). Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)). The first two types of cause are not applicable to this case.

Ineffective assistance of counsel, although requiring more analysis, also does not excuse the default. An ineffective assistance of counsel asserted to excuse a default must, itself, be properly preserved in the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346, 352 (7th Cir. 2009). Petitioner did not assert an ineffective assistance of counsel argument for failure to assert the alleged cross-examination and closing argument claim.

Petitioner's assertion of other unrelated ineffective assistance of counsel arguments in Claims One and Two do not excuse her default either. Although ineffective assistance of counsel is a single claim, *Pole v. Randolph*, 570 F.3d 922, 934 (7th Cir. 2009) (citing *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005)), Petitioner must raise the particular factual basis for each aspect of the alleged ineffective assistance of counsel to preserve the respective argument. *Pole*, 570 F.3d at 935 (citing *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007)). "A bare mention of ineffective assistance of counsel is not sufficient to avoid a procedural default; [Petitioner] must have 'identified the specific acts or omissions of counsel that form the basis for [his] claim of ineffective assistance.'" *Johnson v. Hulett*, 574 F.3d 428, 432 (7th Cir. 2009) (quoting *Momient-El v. DeTella*, 118 F.3d 535, 541 (7th Cir. 1997)). "Petitioner cannot argue one theory [of ineffective

assistance of counsel] to the state courts and another theory, based on different facts, to the federal court." *Johnson*, 574 F.3d at 432 (citing *Everett v. Barnett*, 162 F.3d 498, 502 (7th Cir. 1998)). The ineffective assistance of counsel arguments in Claims One and Two cannot be used to excuse the defaults in this claim.

This leaves Petitioner with the fundamental miscarriage of justice (actual innocence) gateway to excuse her default. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 133 S. Ct. at 1928 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

Petitioner does not argue that she is actually innocent, and there is nothing in the record to suggest a plausible actual innocence argument. She confessed to shooting Campbell claiming it was self-defense. Campbell's body was discovered in Petitioner's home. She also confessed to disposing of the murder weapon, and fled from custody for multiple years. The finder of fact rejected her self-defense claim resulting in the murder conviction. Petitioner cannot show she

26

was actually innocent of murdering Campbell. Petitioner's challenge to the "hell have no fury," "the victim's pants were found open," and "doesn't have to take the stand and all that jazz" comments are procedural defaulted.

For the sake of completeness, this Court has already noted that the prosecutor's reference to Petitioner's constitutional rights as "all that jazz" was inappropriate and should be avoided by any competent prosecutor in the future. In any event, this inappropriate comment does not justify relief for all the reasons stated herein. Any prejudice from this comment was lessened by the parties' decision to proceed with a bench trial.

This leaves Petitioner the two preserved arguments regarding: (1) the prosecution's comment in closing argument regarding Petitioner's failure to call Kovacs as a witness; and, (2) the "Lucky for you" and "Oh, wow" comments the prosecutor made during the cross-examination of Petitioner. A prosecutor's comments violate due process only if: (1) the comments were improper; and, (2) the improper comments violated Petitioner's right to a fair trial when considering the trial record as a whole. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Ellison v. Acevedo*, 593 F.3d 635-36 (7th Cir. 2010). It is not enough that the challenged comments were improper and prejudicial, instead, "'the relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Ellison*, 593 F.3d at 636 (quoting *Darden*, 477 U.S. at 181). Factors for the Court to consider in evaluating whether there is a due process violation including: "'(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether Petitioner invited the response, (4) the trial court's instructions, (5) the weight of the

evidence against Petitioner, and (6) the Petitioner's opportunity to rebut.'" *Ellison*, 593 F.3d at 636 (quoting *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000)).

Although the state appellate court did not cite directly to *Darden*, it is clear that the state court applied the proper standard when it rejected Petitioner's claim. The court concluded that the comments were improper (the first *Darden* step), but then concluded that there was no evidence of prejudice (the second *Darden* step). *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *8. The state appellate court decision was an adjudication on the merits under *Darden*, and the decision was not contrary to *Darden*.

The state appellate court ruling was also not an unreasonable application of *Darden*. Perhaps it was not the best choice for the prosecutor to comment on Petitioner's failure to call Kovacs as a witness, and certainly the prosecutor should not have made sarcastic comments during cross-examination. However, as the state appellate court also recognized, the comments did not deprive Petitioner of a fair trial.

The trial court sustained an objection to the "Lucky you" comment curing any prejudice. *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *8. Furthermore, these challenged comments were cured by the fact that it was a bench trial where the trial judge, as the finder of fact, would have known to reject the improper comments. *Woodford*, 537 U.S. at 24 (instructing that state court judges are presumed to both know and follow the law). These isolated challenged comments pale in contrast to the overwhelming nature of Petitioner's guilt. The Court cannot say that the state court's rejection of her claim was an unreasonable application of *Darden*. Claim Three is denied.

### 4.    Claim Four

Petitioner's final argument is that the trial court erred in allowing the introduction of an expert report stating that Petitioner was legally sane at the time of the killing.   (Dkt. 1, pg. 11.) She was examined by Dr. Jonathan Kelly, a staff forensic psychologist employed by Cook County's Forensic Clinical division.  *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *1.  Dr. Kelly concluded that Petitioner was fit to stand trial, and legally sane at the time of the killing.  *Id.*  She argues this was improper because her sanity was not at issue in the case.

The introduction of evidence does not raise a cognizable issue.   The Court cannot review the state evidentiary ruling because "'habeas corpus relief does not lie for errors of state law.'" *Estelle v. McQuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffres*, 497 U.S. 764, 780 (1990)).

It is true that evidentiary errors do result in a federal constitutional violation when the error "'so infused the trial with unfairness as to deny due process of law.'"  *Estelle*, 502 U.S. at 75 (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)).   However, the Court fails to see any due process violation.

Dr. Kelly's expert opinion was not introduced at trial by the prosecution.   *Halligan Direct Appeal*, 2014 IL App (1st) 131466, 2014 WL 4402830, at *6.  Dr. Kelly's report was considered in a pre-trial motion regarding the State's witnesses Drs. Cooper and Lourgos.  *Id.* at *2.  These doctors were called by the prosecution during trial to rebut Petitioner's self-defense argument.   The doctors had considered Dr. Kelly's report, and the Court had held a pre-trial hearing to consider whether the doctors could refer to Dr. Kelly's report at trial.  *Id.*  Drs. Cooper and Lourgos testified, however, that their opinions were based entirely on their own analysis, and

not on Dr. Kelly's report. *Id.* At most, Dr. Kelly's report was raised by defense counsel in cross-examination of Dr. Cooper, but as the state appellate court noted, Petitioner cannot complain about an alleged error he invited. *Id.* at *6.

Beyond the prosecution not introducing Dr. Kelly's report, any evidence regarding Petitioner's sanity would not have prejudiced her defense. Being sane and acting in self-defense are not mutually inconsistent positions. To the contrary, acting in self-defense can be seen as a rational sane action. Additionally, as mentioned above, the finder of fact was a judge conducting a bench trial. The judge is presumed to have followed the law and ignored any irrelevant or improperly prejudicial evidence. Claim Four must also be denied.

## III.    Certificate of Appealability

The Court declines to issue a certificate of appealability. Petitioner cannot make a substantial showing of the denial of a constitutional right, or that reasonable jurists would debate, much less disagree, with this Court's resolution of Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

## IV.    Conclusion

Petitioner presented the serious issue of a domestic abuse self-defense at her bench trial. This Court's careful review of her trial transcript and direct appeal reveals that she was not denied any constitutional right during those proceedings. Petitioner's habeas corpus petition (Dkt. 1.) is denied on the merits. This Court concludes that Petitioner received a fair trial which was reasonably reviewed on direct appeal. Any pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk is instructed to: (1) terminate

Respondent Margaret Burke, and replace with her Petitioner's current custodian, Glen Austin, Acting Warden, Logan Correctional Center; (2) alter the case caption to *Halligan v. Austin*; and, (3) enter a judgment in favor of Respondent and against Petitioner.    Civil Case Terminated.

ENTERED:

**Chief Judge Rubén Castillo**
**United States District Court**

**Dated: February 12, 2018**